

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CONRAD DE LOS SANTOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOHNSON & JOHNSON and** | ) | **2:21-cv-01208-LSC** |
| **JOHNSON & JOHNSON** | ) | |
| **CONSUMER, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM OF OPINION**

Plaintiff Conrad De Los Santos, an emergency room physician, brings this products liability action against Defendants Johnson & Johnson and its subsidiary, Johnson & Johnson Consumer, Inc. ("JJCI"), for health problems allegedly caused by benzene in certain aerosol sunscreen products manufactured by JJCI. Before this Court are Plaintiff's motion for partial summary judgment; Plaintiff's motions to exclude expert testimony; Defendants' motions for summary judgment; Defendants' motion to exclude expert testimony; and Defendants' motion for sanctions based on spoliation of evidence. (Docs. 33, 34, 35, 37, 39, 41, 43.) The motions are fully briefed and ripe for review. For the reasons discussed below,

Defendants' motions are due to be **GRANTED**, and Plaintiff's motions are due to be **DENIED AS MOOT**.

I.   **BACKGROUND**[1]

### A. Plaintiff's Claims

Plaintiff used certain aerosol sunscreen products manufactured by JJCI every week from at least 2010 until late 2020. (Docs. 45-25 at 11; 33-6 at 165:5–11, 371:6–18.) In August of 2020, Dr. W. Winn Chatham diagnosed Plaintiff with systemic lupus erythematosus (lupus), an autoimmune disease. (Docs. 48 ¶ 30; 69-3 ¶ 30; 33-6 at 162:7–12.) Plaintiff then increased his sunscreen usage to multiple times daily on the advice of Dr. Chatham. (Doc. 33-6 at 164:4–165:4, 320:9–14.) Within the ensuing six months, Plaintiff was also diagnosed with Crohn's, another autoimmune disease. (*Id.* at 63:7–8, 83:22–84:4, 178:12–14.)

One year after Plaintiff's lupus diagnosis, in July of 2021, JJCI recalled all lots of five of its aerosol sunscreen product lines. (Doc. 1-1 at 2.) According to the recall

---

[1]      The facts set out in this Opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record….").

announcement, JJCI recalled the sunscreen because "[i]nternal testing identified low levels of benzene in some samples of the products." (*Id.*) The recall notice described benzene as "a human carcinogen, a substance that could potentially cause cancer depending on the level and extent of exposure." (*Id.* at 3.) It explained that "[b]enzene is ubiquitous in the environment. Humans around the world have daily exposures indoors and outdoors from multiple sources." (*Id.*) The recall notice also claimed that, although "daily exposure to benzene in these aerosol sunscreen products at the levels detected in [JJCI's] testing would not be expected to cause adverse health consequences," JJCI decided to recall the products "[o]ut of an abundance of caution." (*Id.*)

At least some of the sunscreen products Plaintiff purchased and used were subject to the recall. (Doc. 33-6 at 329:8–12.) Three days after the recall announcement, Plaintiff stopped using the recalled products. (*Id.* at 245:21–246:10, 372:4–10.)

Over the next two years, Plaintiff underwent three bone marrow biopsy procedures. (Docs. 51-7 at 2; 51-8 at 2; 69-3 ¶ 48.) The first biopsy, conducted in the same month as the recall, showed precancerous cells but no dysplasia. (Docs. 33-6 at 181:3–17; 33-7 at 204:21–205:21.)  The second bone marrow biopsy, conducted in March of 2022, showed ten to twenty percent dysplasia and

dysmegakaryopoiesis but "normal karyotype and no clinically significant genetic variants." (Docs. 33-3 at 62:1–5, 63:10–64:1; 33-6 at 181:3–17, 293:9–15; 33-7 at 204:21–206:2; 33-37 at 4; 51-7 at 2–3; 51-8 at 2.) Dr. Benjamin Jones, Plaintiff's expert, characterizes these results as "abnormalities, though not constituting frank disease that requires active therapy or treatment." (Doc. 33-37 at 7.) The third and most recent biopsy, conducted in May of 2023, showed "adequate hematopoiesis," "no diagnostic morphologic features of a myelodysplastic syndrome," "[n]o cytologic abnormalities" of the blood, and otherwise "[n]ormal quantit[ies]" and "[n]ormal morphology" of measured traits. (Doc. 51-8 at 2–3.) Dr. Jones describes the results of this third biopsy as "relatively normal," noting that "[t]here was no dysplasia seen on that biopsy." (Doc. 33-3 at 19:18–23.)

Less than two months after his first bone marrow biopsy, Plaintiff filed this lawsuit. (Doc. 1.) He now claims that benzene exposure caused "all of [his] current medical problems," including lupus and Crohn's, low blood cell counts,[2] an episode of atrial fibrillation, bone marrow dysplasia, dysmegakaryopoiesis, and potentially hyperparathyroidism. (Doc. 33-6 at 83:12–85:15.)

---

[2]     Plaintiff states that his white blood cell count "naturally had always been on the low normal side," and has occasionally "lowered" from that "low baseline" since at least 2002, reportedly due to a viral infection and radiation therapy. (Doc. 33-6 at 107:6–13, 110:8–12; *see* doc. 33-3 at 62:16–19, 68:5–9, 94:3–96:22.)

**B. Spoliation Claims**

In February of 2022, Plaintiff provided signed, verified answers to JJCI's interrogatories and requests for production. (Doc. 45-25.) Among other things, JJCI asked Plaintiff to identify each sunscreen product he used; to describe "any tests, analyses, assessments, or examinations" that any person or entity conducted on the products at issue; and to produce all sunscreen containers still in his possession, "whether or not [any such] containers contain any residual" sunscreen. (*Id.* at 10, 21, 28.) In identifying the products he used, Plaintiff stated that he possessed "six empty containers" of the sunscreen products at issue. (*Id.* at 12.) However, in response to both the request for a description of "any tests" conducted and the request to produce "all" containers, Plaintiff referred JJCI to his answer to another interrogatory. (*Id.* at 21, 28.) That referenced answer stated, "some products were returned to the retail stores where they were originally purchased," and "[f]or the products that Plaintiff still has in his possession, please note the refund issued by Johnson and Johnson." (*Id.* at 14.) Plaintiff did not produce any sunscreen containers in response to JJCI's request for production, nor has he amended his responses to these discovery requests. (Docs. 65 at 6; 48 ¶¶ 36–38; 69-3 ¶¶ 34, 38.)

Five months later, Plaintiff retained Dr. Ryan Cheu to test the residual content of his six "empty" sunscreen containers for the presence and concentration of benzene. (Docs. 48 ¶ 39; 69-3 ¶ 39; 45-27 at 3; 51-10 at 4.) The retention agreement contemplated the use of a testing method called headspace gas chromatography mass spectrometry ("HS-GC-MS"). (Docs. 48 ¶ 40; 69-3 ¶ 40; 51-10 at 4.) This, according to Dr. Cheu, "is a destructive test," "so the [sunscreen] samples are, in essence, destroyed for analysis." (Doc. 45-13 at 134:11–135:4, 343:8–18.) Dr. Cheu performed two rounds of testing on the sunscreen samples on or about August 12 and 16, 2022. (Docs. 48 ¶ 42; 69-3 ¶ 42.)

The following month, this Court held a telephone conference with the parties. (Docs. 48 ¶ 34; 69-3 ¶ 34.) During that conference, Defendants learned for the first time that Plaintiff's "empty" sunscreen containers were not entirely empty, and that Plaintiff had tested the residual content of those containers for the presence of benzene. (Docs. 48 ¶ 34; 69-3 ¶ 34; 45-26; 45-27.) Over the next five weeks, Defendants sent three letters to Plaintiff demanding all materials related to the testing performed by Dr. Cheu. (Docs. 45-26; 45-29; 45-30.) Plaintiff ultimately produced the six sunscreen containers sometime after October 27, 2022 (doc. 45-30 at 3), along with a letter stating, "whether there is enough residual product for your scientists to test cannot be answered by us." (Doc. 51-5 at 2.) Defendants

returned the containers to Plaintiff sometime thereafter, claiming they were unable to extract enough residual content to perform their own testing. (Docs. 69-3 ¶ 34; 65 at 7.)

## II.   STANDARDS OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all

factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213-14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (*per curiam*) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

**B.  Admissibility of Expert Testimony Under *Daubert***

Expert witness testimony, including opinion testimony, is admissible under Federal Rule of Evidence 702 if (1) the expert is qualified to testify on the subject; (2) the expert applies reliable principles and methods in reaching conclusions; and (3) the testimony is relevant and helpful to the trier of fact. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*)). The burden of establishing qualification, reliability, and helpfulness lies always with the proponent of expert testimony. *Frazier*, 387 F.3d at 1260.

The Supreme Court recognized in *Daubert* that Rule 702 imposes a "gatekeeping role" on district court judges. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The purpose of the gatekeeping function is to ensure an expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see Daubert*, 509 U.S. at 595 (noting that "[e]xpert evidence can be both powerful and quite misleading" (citation omitted)). "[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Chapman*, 766 F.3d at 1306 (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316–17 (11th Cir. 1999)).

A district court's "focus" in conducting the Rule 702 inquiry is "solely" on the expert's employed "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "But conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*; *Frazier*, 387 F.3d at 1261 ("The trial court's gatekeeping function requires more than simply taking the expert's word for it." (citations and quotation marks omitted)). Rather, if an expert generates an opinion by extrapolating from insufficient data, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

 "Because the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court," *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005), district courts receive "considerable leeway in both how to test the reliability of evidence and determining whether such evidence is reliable." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (citing *Kumho Tire*, 526 U.S. at 151–53).

### C.  Spoliation Sanctions

Spoliation refers to "the destruction of evidence or the significant and meaningful alteration of a document or instrument." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (quoting *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003)); *see Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) ("Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." (citation omitted)). Courts impose sanctions on parties that spoliate evidence "to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (citing *Gratton v. Great American Communications*, 178 F.3d 1373, 1374 (11th Cir. 1999)). Because spoliation is an evidentiary issue, "federal law governs the imposition of spoliation sanctions." *Id.*

A district court "is afforded a considerable amount of discretion in imposing sanctions" for spoliation. *Id.* at 943. This "broad discretion" comes from both the Federal Rules of Civil Procedure and the court's "inherent power to 'manage its own affairs and to achieve the orderly and expeditious disposition of cases.'" *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023) (quoting *Flury*, 427 F.3d at 944); *see, e.g.*, FED. R. CIV. P. 37(c)(1) (allowing courts to

impose "appropriate sanctions" for a party's failure to disclose or supplement discovery). Appropriate sanctions may include, among other things, *see id.*, "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Flury*, 427 F.3d at 945 (citation omitted).

### III.   DISCUSSION

Before turning to the parties' motions for summary judgment, this Court must resolve Defendants' motion for sanctions and motion to exclude the testimony of Plaintiff's expert witnesses. But first, it is important to set the stage on which these contested motions play out.

Plaintiff's seven claims[3] in this action vary in form but not in substance. Each claim—indeed, this entire case—turns on one issue: whether benzene in sunscreen products manufactured by JJCI and used by Plaintiff caused injuries to Plaintiff's health. (*See* doc. 33 at 20 (Plaintiff asserting that "[t]he only issues in genuine dispute center on causation").) Benzene is a chemical. As such, to prove causation, Plaintiff must establish: (1) benzene is capable of causing the injuries he alleges

---

[3]     Count One: "(AEMLD) Product Liability – Design Defect"; Count Two: "(AEMLD) Product Liability – Failure to Warn"; Count Three: "Negligence/Negligent Design, Manufacture & Sale"; Count Four: "Negligent Failure to Warn"; Count Five: "Misrepresentation"; Count Six: "Breach of Implied Warranty of Merchantability"; Count Seven: "Breach of Implied Warranty of Fitness."

(general causation); (2) he was exposed to benzene through Defendants' products; (3) he was exposed to enough benzene to cause his alleged injuries (the toxic dose); and (4) his exposure to benzene in fact caused his alleged injuries (specific causation). *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005). "This type of proof requires [reliable] expert testimony…." *Id.* at 1237.[4]

Plaintiff attempts to shed this evidentiary burden by asserting two arguments. First, he argues that "this is just a consumer product-liability case," not a toxic tort case. (Doc. 56 at 19.) It is both. "Toxic tort litigation is a subset of products liability in which 'cases ... are won or lost on the strength of the scientific evidence presented to prove causation.'" *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 690 (N.D. Ga. 2006) (quoting *Rider*, 295 F.3d at 1197); *see Sutherland v. Matrixx Initiatives, Inc.*, No. CIV.A. 04-AR-0129-M, 2006 WL 6617000, at *1 (N.D. Ala. Nov.

---

[4]     To explain this evidentiary requirement, the *McClain* court offered, among other things, these "key principles of toxicology that a court should consider in any attempt to establish whether a chemical exposure was causally related to a specific adverse effect or disease in an individual":

> Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect. Often low dose exposures—even for many years—will have no consequence at all, since the body is often able to completely detoxify low doses before they do any damage. Furthermore, for most types of dose-response relationships following chronic (repeated) exposure, thresholds exist, such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual.

*McClain*, 401 F.3d at 1242 (internal citations and quotation marks omitted) (quoting David L. Eaton, *Scientific Judgment & Toxic Torts – A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & POL'Y 1, 9, 11, 13, 15 (2003)).

7, 2006) ("[It is] well understood that a claim that a defective product caused personal injury of the 'toxic tort' variety cannot proceed to trial without an expert to demonstrate not only its toxicity, but general and specific causation."). Second, Plaintiff urges this Court to reject the Eleventh Circuit's *McClain* decision, casting it aside as a "pariah." (Doc. 56 at 21.) He does so on the grounds that "*McClain* did not rely upon any drug or pharmaceutical cases; instead, it relied on environmental exposure decisions." (*Id.*) This Court is unpersuaded. The Eleventh Circuit's *McClain* decision is not only well-reasoned, thorough, and irrefutably applicable here; it is also binding. *In re Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015) ("[C]ourts of this circuit are bound by the precedent of this circuit.").

Accordingly, the "minimal facts necessary" for Plaintiff to prevail on his claims include (1) scientific knowledge of the harmful level of exposure to benzene; and (2) knowledge that Plaintiff was exposed to such quantities. *McClain*, 401 F.3d at 1241 (quoting *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)); *Chapman*, 766 F.3d at 1316 (holding that plaintiffs are "*required* to have *Daubert*-qualified, general and specific-causation-expert testimony that would be admissible at trial to avoid summary judgment" (emphasis in original) (citing *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1252 (11th Cir. 2010) (*per curiam*))).

### A.  Motion for Sanctions Based on Spoliation of Evidence

Defendants move for sanctions based on Plaintiff's materially incomplete or misleading discovery responses and his failure to produce key evidence until more than eight months after Defendants first requested it and after he destroyed that evidence through testing without notice to Defendants. Plaintiff denies the destruction of evidence, stands by his discovery responses, and rejects any implication of malice or bad faith.

There is no doubt that Plaintiff, through his agents, destroyed evidence by subjecting the residual content of his sunscreen containers to destructive testing. Yet, incredibly, in his response to Defendants' Statement of Undisputed Material Facts, Plaintiff "[d]ispute[s] that Dr. Cheu destroyed evidence through the testing performed." (Docs. 48 ¶ 44; 56 ¶ 44.) To support this factual dispute, Plaintiff cites a ten-page section of Dr. Cheu's deposition transcript. (Doc. 56 ¶ 44 (citing doc. 33-15 at 385:20–395:4).) Nothing in that cited section—or elsewhere, for that matter—of Dr. Cheu's deposition transcript provides any grounds for Plaintiff to dispute the destructive nature of Dr. Cheu's testing. To the contrary, Dr. Cheu expressly states that HS-GC-MS "is a destructive test," "so the [sunscreen] samples are, in essence, destroyed for analysis." (Doc. 33-15 at 134:11–135:4, 343:8–18.) Notably, Plaintiff later concedes that "technically it is true that some portion of the

residual material in the retained [sunscreen] cans w[as] 'destroyed' during" testing. (Doc. 65 at 8.)

Plaintiff also provided materially incomplete or misleading discovery responses by (1) representing that he had returned the sunscreen containers for a refund instead of producing them as Defendants requested; (2) describing the six sunscreen containers in his possession as "empty," and (3) failing to correct or supplement his responses. (Doc. 45-25 at 10, 14, 21, 28.) Plaintiff offers no explanation as to why he represented having returned the sunscreen containers for a refund instead of producing them at Defendants' request. He does, however, defend his description of the containers as "empty" by asserting that "'empty' doesn't mean a hundred percent empty," and that the containers "were indeed at the end of their economic lifespan." (Docs. 45-2 at 375:3–377:21; 56 ¶ 34.) Although this explanation may excuse Plaintiff's initial discovery response, it does not excuse his failure to supplement or correct that response as required by the Federal Rules of Civil Procedure. FED. R. CIV. P. 26(e)(1)(A) ("A party who has … responded to an interrogatory [or] request for production … must supplement or correct its … response … in a timely manner if the party learns that in some material respect the … response is incomplete or incorrect.…"). At the very latest, Plaintiff's obligation to supplement or correct his discovery responses was triggered when his

counsel "became aware that while these cans were for practical purposes 'empty' that there might be enough residual chemical material in the cans to allow for some testing to be done to see if the [b]enzene levels were elevated." (Doc. 65 at 3.) But instead of correcting his responses, notifying Defendants, or producing the sunscreen containers, Plaintiff sent this evidence to Dr. Cheu for destructive testing.

Having concluded that Plaintiff destroyed evidence and violated the rules of discovery, this Court must now determine whether his conduct warrants sanctions and, if so, the proper remedy. As explained below, sanctions are warranted, and the minimal appropriate remedy is the exclusion of the HS-GC-MS testing results.

When deciding whether to impose sanctions for spoliation, courts in this circuit consider: (1) the importance of the spoliated evidence; (2) prejudice to the non-spoliating party; (3) whether the spoliating party acted in bad faith; and (4) the potential for abuse if sanctions are not imposed. *Tesoriero*, 965 F.3d at 1184 (citing *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018)); *accord Story v. RAJ Properties, Inc.*, 909 So. 2d 797, 803 (Ala. 2005). This Court addresses each factor, though Plaintiff's arguments focus almost entirely on denying any bad faith.

### 1. *The spoliated evidence is critically important.*

Plaintiff claims benzene in Defendants' sunscreen caused all his current health issues. To prove it, he must show he was exposed to sufficient doses of benzene through Defendants' sunscreen to cause those health issues.  *McClain*, 401 F.3d at 1239. The only evidence Plaintiff offers to establish that the sunscreen he used contained benzene comes from the HS-GC-MS testing results of the residue from the six sunscreen containers he spoliated. The significance of this evidence is clear: without it, Plaintiff has no evidence he was exposed to any benzene, let alone enough benzene to cause his injuries.[5] To that end, all of Plaintiff's causation experts rely on the HS-GC-MS testing results in forming their opinions. (Docs. 45-24 at 3, 7; 45-42 at 10; 45-43 at 7.) The importance of this evidence is beyond dispute.

### 2.  *Defendants suffered substantial prejudice.*

---

[5]      Plaintiff frequently refers to certain third-party testing purporting to show elevated levels of benzene in some lots of sixty-nine brands of sunscreen. (*See, e.g.*, docs. 33 ¶ 11; 1-2 at 13.) This supposed evidence suffers numerous flaws refuting its admissibility and relevance. For example, less than five percent of unique batches tested by that third party showed benzene levels exceeding federal allowance. (*See* doc. 1-2 at 13.) And not a single one of Plaintiff's six retained sunscreen containers came from a lot shown by that third-party testing to contain benzene. (*Compare* doc. 45-25 at 12 *with* doc. 1-2 at 13–16.) Other evidence is similarly deficient. (Doc. 69-15 at 57.) Despite Defendants' attacks on the admissibility and relevance of this evidence, Plaintiff neither defends its admissibility nor offers other evidence tying the results of that third-party testing to this case—such as by showing that he bought JJCI's sunscreen from stores that sold contaminated lots.

Plaintiff's unilateral decision to subject critical evidence to destructive testing incurably prejudiced Defendants. As aptly stated in *Graff*, another products liability action involving a plaintiff's unilateral destructive testing of key evidence without notice to the defendants, "[t]he prejudice [is] really two-fold." 310 F. App'x at 302.

"First, defendants were denied the same testing opportunities as plaintiffs." *Id.* Plaintiff's conduct in ignoring discovery procedures deprived Defendants of the opportunity to inspect the sunscreen containers prior to testing, jointly select an independent third-party testing facility, participate in and observe the testing, and determine whether the containers had enough residue for the parties to conduct their own separate tests. Having so deprived Defendants of "a fair contest," Plaintiff now attempts to use this ill-gotten evidence to bolster his claims. *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958).

Second, Plaintiff "effectively prevented everyone—[P]laintiff[], [D]efendants, and the [C]ourt—from receiving more reliable test results." *Graff*, 310 F. App'x at 302. Plaintiff argues that the results of the HS-GC-MS testing would have been the same regardless of who performed the testing. (Doc. 65 at 7.) But this argument presumes the completeness and propriety of Dr. Cheu's testing— presumptions Defendants fiercely contest. For example, Defendants point out that

Dr. Cheu took no steps to determine whether the residue he tested was representative of the contents of a full can of sunscreen. (Doc. 45-13 at 354:13–17.) This fact is particularly noteworthy in light of Plaintiff's assertions that the benzene in the sunscreen comes from the propellant (doc. 69-1 ¶ 21; *see* doc. 69-12 at 2), and that when, as with the containers Dr. Cheu tested, a sunscreen container is "near empty," "the propellant comes out only and no product." (Doc. 33-6 at 374:13–19.)

 In other words, the results of Dr. Cheu's testing may overestimate the true benzene content of the sunscreen by orders of magnitude unknown to the parties or to this Court. As such, "Plaintiff's spoliation of critical evidence in this case deprived [Defendants] of an opportunity to put on a complete defense," and "[t]he resulting prejudice to [D]efendant[s] is incurable." *See Flury*, 427 F.3d at 947.

### 3. *Plaintiff's conduct implies bad faith.*

Despite their disregard for the rules of discovery, Plaintiff and his counsel vehemently deny anything "'malicious' or any act in 'bad faith'" related to their destruction of critical evidence. But "this circuit does not require a showing of malice in order to find bad faith." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009). It does, however, require more than "mere negligence." *Id.*

Eleventh Circuit precedent establishes that bad faith in the spoliation context may be found circumstantially. *Skanska*, 75 F.4th at 1314; *see Flury*, 427 F.3d at 946 (suggesting that courts "should weigh the degree of the spoliator's culpability against the prejudice to the opposing party"). District courts have synthesized this precedent to enunciate a set of factors that, if satisfied, demonstrate bad faith through circumstantial evidence. *See, e.g.*, *Waters v. AIG Claims, Inc.*, 608 F. Supp. 3d 1120, 1137 (M.D. Ala. 2022), *appeal dismissed*, No. 22-12414-AA, 2023 WL 3375535 (11th Cir. Mar. 24, 2023); *Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*, No. 1:09-CV-141-MHT, 2010 WL 11425322, at *2 (M.D. Ala. Feb. 18, 2010), *report and recommendation adopted*, No. 1:09-CV-141-MHT, 2010 WL 11425321 (M.D. Ala. Mar. 5, 2010) (collecting cases). These factors include: (1) evidence material to a claim or defense once existed; (2) the spoliating party caused or allowed the evidence to be lost; (3) the spoliating party knew or should have known of its duty to preserve the evidence; and (4) the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator. *Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL 3823390, at *16 (S.D. Fla. Nov. 16, 2009), *cited with approval in Tesoriero*, 965 F.3d at 1184.

Plaintiff does not challenge the first three factors. Material evidence once existed: Dr. Cheu's testing destroyed twenty-one sunscreen residue samples and

completely spoliated the remnants of at least one sunscreen container. (*See* docs. 48 ¶¶ 40–42; 69-3 ¶¶ 40–42.) Plaintiff caused or allowed this spoliation by affirmatively engaging Dr. Cheu to conduct the destructive testing. Plaintiff and his counsel knew or should have known of their duty to preserve this evidence given not only its importance, but also given that Defendants had requested its production six months prior to its destruction.[6] *Cf. Oil Equip. Co. Inc. v. Mod. Welding Co. Inc.*, 661 F. App'x 646, 654 (11th Cir. 2016) (*per curiam*) (concluding that "the most severe sanction was warranted" where the plaintiff "destroyed or allowed the destruction of" evidence "with knowledge that the evidence was critical to a potential lawsuit and to [the defendant's] potential defenses" and "without providing [the defendant], as it had requested, notice and an opportunity to gather evidence in its defense").

As to the fourth factor, this Court concludes that the destruction of critical evidence in this case cannot be credibly explained as not involving bad faith by the reasons proffered by Plaintiff and his counsel. Plaintiff asserts he sent the sunscreen to Dr. Cheu merely "to see if there was enough material in any of the cans to allow for a determination of the level of [b]enzene." (Doc. 65 at 3.) This

---

[6]      The Court notes that, although Plaintiff's counsel shares responsibility for these discovery violations, Plaintiff graduated from law school in 2001 and therefore should be familiar with the basic tenets of discovery, including the duty to preserve evidence. (Doc. 45-2 at 42:5–45:18.)

assertion is belied both by Dr. Cheu's retention agreement, which expressly contemplates the HS-GC-MS testing, and by Plaintiff's failure to notify Defendants that "there was enough material" for benzene testing until after the destructive testing had occurred.

For his part, Plaintiff's counsel contends that subjecting the sunscreen to destructive testing "was a reasonable thing to do," and that he "did not correlate testing as equivalent to destruction." (*Id.* at 6.) This contention is also belied by the record. Counsel represents that, prior to the destructive HS-GC-MS testing in this case, he "served as Co-Chair of the Plaintiff Science Committee in [another] litigation and had worked in understanding how to evaluate and test aerosolized chemicals." (*Id.* at 2.) Through that experience, counsel had "become aware" of HS-GC-MS testing. (*Id.*) These representations establish counsel's experience and familiarity with HS-GC-MS testing. As such, they greatly undermine his claim of ignorance regarding the destructive nature of the same.

This Court is loath to pronounce "bad faith" in any context. But, at least as that term is used in the spoliation context, the circumstances here leave no choice. This is not a case where evidence was inadvertently lost or destroyed "pursuant to a routine policy." *See, e.g.*, *Tesoriero*, 965 F.3d at 1185–86 (finding no evidence of bad faith where a broken, allegedly defective chair was removed for repair and

ultimately discarded "soon after the accident"). Rather, it is one where Plaintiff ignored Defendants' request to produce key evidence and allowed that evidence to be destroyed. *Cf. id.* at 1185 (distinguishing *Flury*, wherein the plaintiff "was 'fully aware that defendant wished to examine the vehicle,' [yet] 'ignored defendant's request and allowed the vehicle to be sold for salvage without notification to defendant of its planned removal,'" noting "no surprise we found bad faith on those facts" (quoting *Flury*, 427 F.3d at 945)). Plaintiff and his counsel's conduct demonstrates bad faith. *See id.*; *Oil Equip. Co.*, 661 F. App'x at 653 ("Generally, bad faith may be found where the plaintiff's actions are responsible for the spoliation of evidence and 'the plaintiff fully appreciated the significance of the evidence to the anticipated litigation.'" (citations omitted)); *cf. Skanska*, 75 F.4th at 1313 (finding the spoliator's "utter failure to implement even the most basic data-protection safeguards egregious—so egregious that an inference of bad faith is easy to make"). Their denial of malicious intent provides no excuse. *Mann*, 588 F.3d at 1310.

### 4. The potential for abuse is immense if sanctions are not imposed.

Courts impose sanctions for spoliation and other discovery abuse "to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583,

590 (4th Cir. 2001); *see Flury*, 427 F.3d at 946 (recognizing that "the spoliation of critical evidence—for whatever reason—may result in trial by ambush" (citation omitted)). Plaintiff's destruction of critical evidence and disregard for the rules of discovery, if not sanctioned, threaten to undermine the integrity of the judicial process, and leave vast potential for abuse.

This potential for abuse is demonstrated in part by the real consequences at hand. Not only has Plaintiff used this testing to support expert testimony on his health conditions having been caused by benzene, "the reliability of which remains questionable, but [P]laintiff's entire case rests upon the testimony of said experts." *Id.* And while the results of Dr. Cheu's testing may have some value, this Court, however, cannot ignore the fact that Defendants were precluded from either participating in those tests or having their own experts conduct confirmatory tests. *Cf. id.* Such one-sided conduct fails to promote "confidence that the process" has "uncover[ed] the truth." *Silvestri*, 271 F.3d at 590.

Also relevant are the hypothetical consequences that could have followed Dr. Cheu's destructive testing had Plaintiff not perceived the results to be favorable to his claims. Specifically, had the results shown a complete absence of benzene in the tested residue, would Defendants or this Court have been any the wiser? The circumstances here suggest, perhaps, "No." Plaintiff failed to correct his

interrogatory responses after it became apparent that his retained sunscreen containers were not completely "empty," but in fact contained enough residue for scientific testing. He also failed to produce the containers until about eight months after Defendants requested them, and at least two months after the destructive testing. Even then, Defendants had to send three separate letters requesting said production. And despite Defendants having requested all information and materials related to the testing, Plaintiff apparently objected on privilege grounds and failed to fully disclose those materials until a year after the destructive testing—*during* Dr. Cheu's expert deposition. (*See* docs. 45-13 at 218:16–22, 220:1–6; 45-29; 45-30.) These circumstances suggest that, if not Plaintiff, some less savory litigant might have kept unfavorable testing results to himself, leaving Defendants and this Court in the dark. Sanctions serve to deter such potential abuse. *Flury*, 427 F.3d at 946.

### 5. The minimal appropriate remedy is the exclusion of the testing results.

Having determined that sanctions are warranted, the next question is the appropriate remedy. Remedial sanctions for spoliation typically include "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Tesoriero*, 965 F.3d at 1184 (quoting *Flury*, 427 F.3d at 945).

"Dismissal represents the most severe sanction available to a federal court, and therefore should only be exercised where there is a showing of bad faith and lesser sanctions will not suffice." *Flury*, 427 F.3d at 944. The Eleventh Circuit has affirmed dismissal sanctions—and even reversed a district court for failing to impose dispositive sanctions—where, as here, a plaintiff ignored a defendant's request to inspect key evidence and instead caused or allowed that evidence to be destroyed. *See id.* at 947 (reversing district court for failing to impose dispositive sanctions, finding prejudice to the defendant "incurable by any sanction other than dismissal" where the plaintiff "inexplicably ignored" the defendant's request to inspect "critical evidence," thus "depriv[ing] the [defendant] of an opportunity to put on a complete defense"); *Oil Equip. Co.*, 661 F. App'x at 654 (affirming dismissal sanctions on similar grounds while quoting *Flury*, 427 F.3d at 947); *accord Capitol Chevrolet, Inc. v. Smedley*, 614 So. 2d 439, 443 (Ala. 1993) (reversing trial court for failing to impose dismissal sanctions for spoliation in products liability action).

Defendants argue that this Court should dismiss this action or, at least, exclude the results of the destructive HS-GC-MS testing and any expert opinions relying on them. The choice is illusory. Plaintiff's claims require expert causation testimony, and his experts' causation opinions all rely on the results of the HS-GC-MS testing; thus, excluding the test results and the expert opinions relying on them

results in the dismissal of Plaintiff's claims. *McClain*, 401 F.3d at 1242; *see Sutherland*, 2006 WL 6617000, at *14 (excluding expert testimony and, "as night must follow day," granting summary judgment "because without an expert to connect a toxin to an injury, there is no toxic tort"). Plaintiff objects to any sanction.

This Court concludes that Plaintiff's unexplained failure to produce key evidence and his later destruction of that evidence without notice to Defendants warrants dismissal of his claims. *See Flury*, 427 F.3d at 947; *Oil Equip. Co.*, 661 F. App'x at 654. But as stated above and further detailed below, even if this Court imposes the lesser of Defendants' proposed sanctions—exclusion of the test results and any expert opinions left unreliable under *Daubert* absent the support of such results—the result is the same. *See Flury*, 427 F.3d at 944; *see also Graff*, 310 F. App'x at 301 (affirming the exclusion of testing results as a remedy for spoliation).

### B. Motion to Exclude Expert Testimony Under *Daubert*

In addition to Dr. Cheu's testing results and related testimony, Defendants seek to exclude the testimony of Plaintiff's four proffered causation expert witnesses: Plaintiff, Dr. Jennifer[7], Dr. Jones, and Dr. McAuley. To survive summary judgement, Plaintiff's claims require the support of reliable expert testimony

---

[7]     To avoid confusion, this Opinion refers to Plaintiff as "Plaintiff" and to his wife, Dr. Jennifer De Los Santos, as "Dr. Jennifer."

establishing, first, that benzene can cause the injuries he claims, and second, that benzene did cause his injuries. *McClain*, 401 F.3d at 1237–38. Defendants challenge the qualification of Plaintiff's experts and the reliability of their opinions.

The Federal Rules of Evidence allow an expert witness to testify in the form of an opinion that would otherwise be inadmissible if offered by a lay witness. FED. R. EVID. 701, 702. A witness may qualify as an expert by virtue of his knowledge, skill, experience, training, or education. *Kumho Tire*, 526 U.S. at 147. But "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368 (11th Cir. 2014). Rather, to offer expert opinion testimony, a witness must qualify as an expert "in the relevant field." *Kumho Tire*, 526 U.S. at 152; *id.* at 149; *but see McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) ("The proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that                                                                       discipline." (quoting *Gaydar v. Sociedad Instituto Gineco–Quirurgico y Planifacacion*, 345 F.3d 15, 24 (1st Cir. 2003))).

A qualified expert's opinion testimony must also be reliable. To be reliable, the testimony must (1) be "based upon sufficient facts or data"; (2) be "the product of reliable principles and methods"; and (3) reflect a reliable application of those

"principles and methods … to the facts of the case." *McClain*, 401 F.3d at 1237

(citing FED. R. EVID. 702). By contrast, "opinion evidence that is connected to existing

data only by the *ipse dixit* of the expert" is not reliable. *Joiner*, 522 U.S. at 146; *see*

*Chapman*, 766 F.3d at 1306 (distinguishing "evidence [that] is genuinely scientific"

from "unscientific speculation offered by a genuine scientist").

In the context of causation in a toxic tort case, experts typically rely upon,

and courts often consider, reliable methodologies including dose-response

relationship, epidemiological evidence, background risks, physiological processes,

differential diagnoses, and clinical studies. *See id.* Though no particular

methodology is necessarily required to reliably show causation, epidemiology "is

generally considered to be the best evidence of causation in toxic tort actions."

*Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 n.8 (11th Cir. 2010) (quoting *Rider*, 295

F.3d at 1198). The Eleventh Circuit recognizes epidemiological evidence, knowledge

of dose-response—i.e., "the hallmark of the science of toxic torts," *McClain*, 401

F.3d at 1240—and background risk of disease as "indispensable" to proving

causation. *Chapman*, 766 F.3d at 1308.

Although this Court addresses each of Plaintiff's causation experts in turn, it

first highlights two major defects uniformly plaguing their testimony. Each defect

independently warrants exclusion.

First, with the exclusion of Dr. Cheu's spoliative testing results, there is no evidence that Plaintiff was exposed to any benzene from JJCI's sunscreen. This leaves his experts without "sufficient facts or data" upon which to base their opinions that benzene caused his injuries. FED. R. EVID. 702. Without that necessary factual predicate, their opinions become nothing more than inadmissible conjecture. *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *see also McClain*, 401 F.3d at 1241 ("In toxic tort cases, '[s]cientific knowledge of the harmful level of exposure to a chemical plus *knowledge that plaintiff was exposed* to such quantities are *minimal facts necessary* to sustain the plaintiff's burden....'" (emphasis added) (citation omitted)).

Second, Plaintiff's response to Defendants' motion to exclude his experts' testimony ignores the substance of Defendants' many challenges to his experts' qualifications and methodology. The response fails to explain (1) how his proffered experts' "knowledge, skill, experience, training, or education" qualify them to offer the specific causation opinions at issue; (2) the "reliable principles and methods," if any, his experts allegedly applied to conclude that benzene caused Plaintiff's injuries; and (3) how his experts' opinions "reflect[] a reliable application of the

principles and methods to the facts of the case." FED. R. EVID. 702. Indeed, with one exception, Plaintiff does not even state—never mind explain or establish the reliable application of—the methodology his experts used to form their specific causation opinions.[8] Plaintiff alone bears the burden of establishing both the qualification of his experts and the reliability of their methodology and opinions. *Frazier*, 387 F.3d at 1260. He thoroughly fails to meet this burden.

Accordingly, the causation opinions offered by Plaintiff and his other experts are due to be excluded.

### 1. Plaintiff

Plaintiff offers his own opinion that benzene from JJCI's sunscreen caused all his current medical problems, including lupus and Crohn's, an episode of atrial fibrillation, hyperparathyroidism, bone marrow dysplasia, and dysmegakaryopoiesis. Notably, Plaintiff is the only expert opining that benzene exposure caused or can cause lupus, Crohn's, atrial fibrillation, or hyperparathyroidism. (Docs. 48 ¶ 55; 69-3 ¶ 55.) Though Defendants aptly challenge Plaintiff's relevant qualifications, this Court accepts Plaintiff as qualified

---

[8] Plaintiff does claim in his response that he conducted a differential diagnosis to arrive at his causation opinions. But he does not explain his process. (Doc. 64 at 24.)

to opine on the causation of his illnesses. Regardless, his opinions are not supported by reliable science or methodology.

Plaintiff is an emergency care physician who practices exclusively in an emergency room setting. (Doc. 45-3 at 39:5–13, 261:7–16.) He describes himself as "a jack-of-all-trades" and "a master of none," but claims to be an expert in "every area of medicine" "[a]s it relates to emergency medical care." (Doc. 45-2 at 65:18–20, 66:11–16.) After providing emergency care, however, Plaintiff refers every patient he sees to an appropriate specialist. (*Id.* at 66:17–67:4.)

Plaintiff is himself neither a specialist nor board certified in gastroenterology, rheumatology, cardiology, hematology, oncology, toxicology, or epidemiology. (*Id.* at 65:13–22; doc. 45-3 at 262:22–263:2, 302:16–20.) While acknowledging that some people devote their careers to epidemiological studies of benzene exposure and the effects of benzene exposure on humans, Plaintiff admits he has not done so. (*Id.* at 305:10–14.) He has published no articles on the health conditions he claims have been or can be caused by benzene, or on benzene generally. (*Id.* at 286:1–19.) And he concedes that he lacks the expertise to conduct exposure modeling with respect to benzene or any other type of chemical or solvent. (*Id.* at 118:14–21.)

Plaintiff contends he became an expert in benzene exposure *after* filing suit, (doc. 45-3 at 56:14–17), despite having already concluded that benzene caused his medical issues upon JJCI's recall announcement—*before* filing suit. (Doc.45-2 at 172:13–22, 174:2–12.) Indeed, he did not even begin researching possible associations between benzene and his illnesses until August of 2021, just one month before filing this lawsuit. (*Id.* at 254:18–23, 399:3–13.) This inverted timeline demonstrates a conclusion-oriented process, not the sort of reliable methodology envisioned by *Daubert*. *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985) ("A scientist who has a formed opinion as to the answer he is going to find before he even begins his research may be less objective than he needs to be in order to produce reliable scientific results."); *see Sutherland*, 2006 WL 6617000, at *7 ("One of the hallmarks of the scientific method is an unbiased pursuit of knowledge. Scientists are to observe and interpret the results of their experiments; they are not to engage in agenda-driven fact finding for the purposes of pending litigation."); *cf. Shirley v. Mitsubishi Motors Corp.*, No. 2:03-CV-2883-JHH, 2005 WL 5988668, at *7 (N.D. Ala. Oct. 25, 2005) (excluding opinions of expert who had "not formed any opinion as a result of research conducted independent of litigation").

These facts and issues raise serious concerns about whether Plaintiff is "an expert in the relevant field," *Kumho Tire*, 526 U.S. at 152, despite his expertise in

emergency medical care. *See Lebron*, 772 F.3d at 1368 ("Expertise in one field does not qualify a witness to testify about others."); *accord Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."). However, because the Eleventh Circuit has held that a "proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline," *McDowell*, 392 F.3d at 1297, this Court accepts that Plaintiff is qualified to opine on medical causation.

Still, Plaintiff's lack of experience in epidemiology and toxicology reflect in his limited methodology. In forming his causation opinions, he "neglect[s] the hallmark of the science of toxic torts—the dose-response relationship." *McClain*, 401 F.3d at 1240. "The expert who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology." *Id.* at 1242.

Plaintiff offers no testimony, opinions, or calculations on the total cumulative dose of benzene to which he was allegedly exposed. (Docs. 48 ¶ 56; 56 ¶ 56.) Rather, he asserts such exposure modeling cannot be done in this context. (Doc.

45-3 at 346:19–347:1.) This assertion directly contradicts the testimony of Plaintiff's own expert toxicologist and epidemiologist, Dr. McAuley, who explains precisely how such modeling could be conducted to support a specific causation opinion in this case. (Doc. 45-14 at 63:2–66:13.) Plaintiff also fails to opine on the toxic dose required to cause his ailments, arguing instead, "if you give someone the dose that [Defendants] exposed me to over a year, that will cause all these medical conditions. So until you can tell me what that dose is, I can't give you an answer." (Doc. 45-3 at 105:9–22.) Rather than employ reliable methodology to form his causation opinions, Plaintiff "has simply substituted his own *ipse dixit* for scientific proof on this essential issue." *McClain*, 401 F.3d at 1242.

The only methodology Plaintiff claims he used to form his causation opinions is a differential diagnosis.[9] (Doc. 64 at 24.) This process involves "compiling, or ruling in, a comprehensive list of possible causes that are generally capable of causing the illness or disease at issue, and then systematically and scientifically ruling out specific causes until a final, suspected cause remains." *Kilpatrick*, 613 F.3d at 1342 (citing *McClain*, 401 F.3d at 1253). Under "circumstances that ensure reliability," a differential diagnosis "may offer an important *component* of a valid

---

[9]     Though the "more precise but rarely used term is differential etiology," because the parties use the term differential diagnosis, this Opinion does as well. *McClain*, 401 F.3d at 1252.

methodology." *McClain*, 401 F.3d at 1252 (emphasis added); *see Rink*, 400 F.3d at 1295 ("[I]n the context of summary judgment … differential diagnosis evidence by itself does not suffice for proof of causation." (citing *Rider*, 295 F.3d at 1199)). A differential diagnosis is only valid if the expert first establishes general causation by reliable methods. *McClain*, 401 F.3d at 1253.

Even if a differential diagnosis were by itself sufficient to support a reliable specific causation opinion, *but see Rink*, 400 F.3d at 1295, Plaintiff has not established that he reliably performed such a diagnosis. His response brief fails to rebut the several shortcomings that Defendants identified with his methodology. It also omits any explanation as to how he conducted his diagnosis, or why this Court should find it reliable. (*See* doc. 64 at 22–25.) "[A]n expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis…." *McClain*, 401 F.3d at 1253. His testimony at deposition offers little more explanation than his brief.

To begin, Plaintiff does not reliably establish that benzene can cause lupus, Crohn's, atrial fibrillation, or hyperparathyroidism. Because he "chose to rely exclusively on medical literature to establish general causation," that literature must provide enough support for his opinions to pass muster under *Daubert.*

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1198 n.11 (11th Cir. 2010). It does not.

He bases his general causation opinion with respect to lupus and Crohn's on a single non-epidemiological study that reportedly supports his opinion that if benzene can cause bone marrow changes, "then it is likely or possible that it will trigger autoimmune problems." (Doc. 33-7 at 87:2–88:20.) Having reviewed that study, this Court finds it somewhat supportive of Plaintiff's position, but insufficient, without more, to reliably support his causation opinions. Though the study suggests an association between certain chemicals and autoimmune disorders, it states the processes behind this association "remain unclear." (Doc. 45-39 at 8.) And although "several explanations have been presented," "none of the concepts is totally supported by direct causal evidence." (*Id.*) It also lists lupus as an autoimmune disorder "with minimal understanding of environmental risk factors." (*Id.*) Despite "unclear" physiological processes, the "minimal understanding" of lupus's risk factors,[10] and a lack of "direct causal evidence," Plaintiff concludes from this lone article that benzene can and did cause both of his autoimmune disorders.

---

[10]   Plaintiff also stated during deposition that he is not certain of the risk factors for Crohn's, and that it is not generally accepted in the scientific community that benzene exposure can cause Crohn's. (Doc. 33-7 at 173:18–175:11.)

Similarly, he concluded from a single article that benzene exposure can cause atrial fibrillation. (Doc. 33-7 at 177:23–179:10.) When asked about the article during deposition, he could not confirm which article he relied upon.[11] (*Id.* at 178:8–183:9.) But he did confirm that he found no epidemiological evidence of a causal connection between benzene exposure and atrial fibrillation. (*Id.* at 184:22–185:3.)

His evidence on general causation for hyperparathyroidism is even weaker. Plaintiff relied on no epidemiological evidence and no literature identifying a causal connection between benzene and hyperparathyroidism.  (*Id.* at 192:14–193:5, 194:18–23.) He candidly agreed it is not generally accepted in the scientific community that there is a connection between benzene and hyperparathyroidism. (*Id.* at 194:12–17.) When asked what he relied on in forming his general causation opinion with respect to benzene exposure causing hyperparathyroidism, Plaintiff

---

[11]    Defendants confronted Plaintiff at deposition with the article they believed he relied on for this point, which they claimed was the only such article he produced. (Doc. 33-7 at 178:3–180:23.) Plaintiff initially indicated it was the correct article, but soon after said, "I'm not certain it is because it looks different to me." (*Id.* at 179:21–22.) Among other things, that article states, "the cardiovascular effects of benzene have rarely been studied," and "little is known about the cardiovascular effect of benzene." (Doc. 45-40 at 2, 3.) After discussing the parameters and results of studies of mice and smokers—the reliability of which are highly suspect as applied to the facts of this case—the article concludes that "benzene exposure is associated with increased cardiovascular disease risk and injury." (*Id.* at 11.) But "showing *association* is far removed from proving *causation*." *Allison*, 184 F.3d at 1315 n.16 (emphasis in original). Regardless, Plaintiff does not claim cardiovascular disease. (Doc. 33-6 at 187:18 ("I don't have cardiovascular disease.").)

answered, "Other than my distinct case, nothing." (*Id.* at 192:9–13.) In other words, Plaintiff assumes benzene exposure *can* cause hyperparathyroidism solely because he has already concluded that benzene exposure *did* cause his hyperparathyroidism. This Court is unwilling to join Plaintiff on such "scientifically unsupported 'leaps of faith' in the causal chain. The *Daubert* rule requires more." *Rider*, 295 F.3d at 1202.

Thus, Plaintiff's differential diagnosis begins with the unreliable assumption that benzene exposure can cause each of his alleged injuries. This is sufficient to conclude that his specific causation opinion is unreliable. *McClain*, 401 F.3d at 1253. But this is not the only unreliable assumption Plaintiff makes in performing his differential diagnosis; they permeate the entire process.

Besides assuming that benzene can cause each of his ailments, Plaintiff also assumes that a single cause must be responsible for them all. His only justification for this assumption is that "coincidences usually almost always do not happen in medicine." (Doc. 33-6 at 189:4–13.) While Plaintiff's Occam's-razor approach may prove useful in emergency medicine practice, it is not the sort of reliable scientific methodology contemplated by Rule 702 or *Daubert*. *See Chapman*, 766 F.3d at 1311 (excluding testimony where the expert "provided no support for his

hypothesis that [the plaintiff's] anemia, neutropenia, and myelopathy resulted from a single cause rather than several causes").

Setting these unreliable assumptions aside, Plaintiff still fails to demonstrate that he conducted a proper differential diagnosis. To do so would require him to compile a "comprehensive list of possible causes" for his alleged injuries, "and then systematically and scientifically rul[e] out specific causes until a final, suspected cause remains." *Kilpatrick*, 613 F.3d at 1342. Again, Plaintiff's response brief makes no mention of any potential causes that he ruled in or out for any of his alleged injuries. His deposition testimony, however, indicates he took steps to rule out some potential causes. For example, Plaintiff claims he ruled out "every single entity" that could have caused atrial fibrillation. (Doc. 33-6 at 186:19–187:19.) And he ruled out viral or bacterial infection as a cause of lupus. (Doc. 33-7 at 147:12–15.) But elsewhere he asserts that "there's no way to rule out what causes lupus and Crohn's." (Doc. 33-6 at 186:1–19.) And when pressed for "just a list" of the causes he considered and ruled out, he replied, "If I had the answer, I would get the Nobel Prize in medicine, because nobody knows … [what] causes lupus [or] Crohn's." (*Id.* at 192:13–193:9.) Absent such a list, his differential diagnosis is inadmissible. *See Chapman*, 766 F.3d at 1310 ("An expert's failure to enumerate a comprehensive list of alternative causes and to eliminate those potential causes

determines the admissibility of proposed specific-causation testimony." (citing *Guinn*, 602 F.3d at 1254)).

Finally, Plaintiff fails to reliably rule out idiopathic causes for his dysplasia and other conditions. This omission further undermines the reliability of his conclusions. *Kilpatrick*, 613 F.3d at 1343 (finding specific causation testimony based on a differential diagnosis unreliable where the expert "could not explain why potentially unknown, or idiopathic alternative causes were not ruled out"); *see Rider*, 295 F.3d at 1199 (finding detailed case reports involving differential diagnoses "not reliable enough, by themselves, to demonstrate the [necessary] causal link" in that, while they may have ruled out some potential causes, they did not rule out the possibility that a patient's symptoms were "simply idiosyncratic or the result of unknown confounding factors"). For example, Plaintiff represents that "the majority of cases of lupus are idiopathic," and "close to 100 percent" of Crohn's cases are idiopathic, yet he dismisses the possibility of idiopathic causes outright because these conditions are relatively rare. (Doc. 33-7 at 319:14–320:9, 324:15–20; *see also id.* at 334:10–14 (dismissing idiopathic atrial fibrillation as "very rare").) *Cf. Kilpatrick*, 613 F.3d at 1342 (excluding testimony where the expert "recogniz[ed] the existence of idiopathic (or unknown) causes of chondrolysis, [yet]

dismissed them by merely stating that the risk of idiopathic chondrolysis is essentially zero").

And although his treating physician, Dr. Jones, recognizes that "people can develop mild dysplasia de novo, … meaning without any previous exposure," (doc. 45-7 at 70:1–3), it does not appear that Plaintiff seriously considered idiopathic causes of his dysplasia. The closest he comes to recognizing idiopathic causes is his statement that the risk factors for bone marrow dysplasia include "bad luck." (Doc. 33-7 at 209:21–210:2, 345:10–20.) He claims he ruled out bad luck as a possible cause by "looking at incidence." (*Id.* at 345:21–346:3.) But when asked for the incidence of dysplasia, he replied, "I don't think that number has even been recorded. I have no idea." (*Id.* at 209:3–7; *see id.* at 353:22–354:6 ("I would say it's low. The issue is that people don't routinely get bone marrow biopsies to know what the prevalence and incidence is of dysplasia.").)

As his testimony firmly demonstrates, Plaintiff builds his causation opinions upon a series of unreliable assumptions. He assumes benzene can cause all his alleged conditions. He assumes every condition was caused by a single source; he assumes it was benzene. He assumes he was exposed to sufficient levels of benzene to cause his conditions, despite having conducted no exposure modeling or dose-response analysis. For expert testimony to be admissible, "it must be 'scientific,'

meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning something more than subjective belief or unsupported assumptions." *McDowell*, 392 F.3d at 1298 (citing *Daubert*, 509 U.S. at 590). Plaintiff's testimony shows little more than "subjective belief" and "unsupported assumptions." *See id.* And with the exclusion of Dr. Cheu's spoliative testing results, he does not even have evidence that he was exposed to benzene. Accordingly, his testimony must be excluded for failure to reflect a "reliable application" of "reliable principles and methods" to "sufficient facts or data." FED. R. EVID. 702.

### 2. *Dr. Jennifer*

According to her Rule 26 disclosure, Dr. Jennifer expects to offer two opinions: (1) that Plaintiff's low white blood cell counts, bone marrow dysplasia, and dysmegakaryopoiesis were not caused by radiation treatment; and (2) those abnormalities were likely caused by benzene from JJCI's sunscreen. (Doc. 45-24 at 8–9.) Defendants argue that Dr. Jennifer is unqualified to render any opinions on causation, though the substance of their argument appears to challenge only her opinion that benzene caused Plaintiff's conditions. (Doc. 48 at 49-50.)

In his response, Plaintiff merely reiterates Dr. Jennifer's qualifications and the opinions she is expected to offer. (Doc. 64 at 26–27.) He does not discuss or attempt to establish the reliability of the methodology, if any, that Dr. Jennifer used

to form her opinions. (*Id.*) Plaintiff bears the burden of establishing not just Dr. Jennifer's qualifications but also the reliability of her opinions. *Frazier*, 387 F.3d at 1260. He appears to abandon that burden altogether; if not, he fails to meet it. *See McClain*, 401 F.3d at 1244 ("The trial court's gatekeeping function requires more than simply taking the expert's word for it." (cleaned up) (quoting FED. R. EVID. 702 advisory committee's note (2000))).

Ignoring Plaintiff's default, Dr. Jennifer's testimony makes clear that, though she may be qualified to opine that radiation treatment did not cause Plaintiff's conditions, she is not qualified to opine that benzene did. Dr. Jennifer is a board-certified radiation oncologist and a board examiner for the American Board of Radiology. (Doc. 33-12 at 47:20–48:8.) She has served on the editorial boards of peer-reviewed medical journals and has published more than eighty (80) peer-reviewed articles. (Doc. 45-24 at 7.) But, by her own admission, none of those articles concern benzene or any other topic relevant to Plaintiff's claims. (Doc. 33-12 at 51:18–52:6.)

Dr. Jennifer admits she is not an expert in hematology, cardiology, gastroenterology, endocrinology, or toxicology, and she "would defer to experts in those fields with regard to a diagnosis and potential cause of disease, including the extent to which benzene may be associated with [related] illnesses." (*Id.* at 68:9–

70:5.) She plainly concedes that she lacks the expertise to rule out potential causes of Plaintiff's illnesses. (Doc. 45-5 at 85:17–86:8.) These concessions alone manifestly establish that Dr. Jennifer is not qualified to reliably opine on causation in this case.

Dr. Jennifer's testimony further establishes that she applied no reliable methodology in concluding that benzene exposure caused Plaintiff's illnesses. Instead, she bases her causation opinion entirely on the temporality of his diagnoses and his alleged exposure to benzene. (*Id.* at 86:9–87:1.) "Such specific causation testimony has been found to be inherently unreliable in this Circuit." *Kilpatrick*, 613 F.3d at 1342 (citing *McClain*, 401 F.3d at 1254 (noting that reliance on a "temporal connection between exposure to chemicals and an onset of symptoms" is "subject to the problem of assuming what the witness is trying to prove")). Moreover, without Dr. Cheu's test results, she has no evidence that Plaintiff was exposed to benzene. As such, her testimony is inadmissible. *Id.*; *Daubert*, 509 U.S. at 589; Fed. R. Evid. 702 (requiring expert testimony to be "based on sufficient facts or data").

### 3. *Dr. Jones*

Dr. Jones, a board-certified medical oncologist and hematologist and Plaintiff's treating physician, offers his opinion that benzene in JJCI's sunscreen

caused Plaintiff's bone marrow dysplasia and dysmegakaryopoiesis. (Doc. 33-37 at 2.) Defendants challenge Dr. Jones's qualifications and the reliability of his opinion. Assuming without deciding that Dr. Jones is qualified to offer this opinion—though, notably, he lacks any formal education on benzene exposure, he performed no research on the same prior to his involvement in this litigation, and he has never seen a patient with alleged benzene exposure other than Plaintiff (doc. 45-7 at 29:9–32:9, 147:4–12)—Plaintiff fails to establish the reliability of his methodology.

Nowhere in his response to Defendants' motion to exclude does Plaintiff discuss what methodology Dr. Jones used to form his causation opinions. Instead, Plaintiff appears to equate repeated assertions of benzene's toxicity with Dr. Jones's having applied "reliable and sound methodology." (Doc. 64 at 21.) Rather than explain Dr. Jones's methodology and its purported reliability, however, Plaintiff merely reiterates, again and again, his assertion that benzene is "toxic to humans." (*Id.* at 20–21.) Besides failing to establish that Dr. Jones applied reliable methodology, these plain assertions also fail to answer the vital questions of general and specific causation, that is, (1) whether benzene can cause the particular injuries Plaintiff alleges[12]; (2) at what level of exposure benzene causes those

---

[12]    This Court's review of the record reveals an apparent consensus in the medical community that benzene can cause certain types of cancer and pre-cancer abnormalities, including bone marrow dysplasia. (*See, e.g.*, doc. 32-2 at 11:17–12:21 (Dr. Jones agreeing that

injuries; and (3) whether Plaintiff was exposed to such levels. *McClain*, 401 F.3d at 1239.

These failures come despite Dr. Jones's acknowledgment that benzene's capacity to cause bone marrow dysplasia is "a dose-dependent effect, meaning the higher the dose, the higher the exposure, the more likely it is to negatively impact the bone marrow and the hematopoietic cells." (Doc. 33-2 at 13:8–17.) But, like the rest of Plaintiff's experts, Dr. Jones does not know the dose of benzene required to cause dysplasia, he does not know the total dose of benzene to which Plaintiff was allegedly exposed, and he performed no exposure assessment or toxicological specific causation analysis, which he concedes he lacks the skill, knowledge, and training to perform.[13] (Docs. 48 ¶ 56; 56 ¶ 56; 45-7 at 25:6–26:9, 158:3–160:3.)

---

"there's no real meaningful dispute that benzene causes cancer," and describing some "potential malignant consequences of benzene exposure" as including myelodysplasia).) Accordingly, this Opinion takes for granted general causation with respect to dysplasia. *See McClain*, 401 F.3d at 1239 ("The court need not undertake an extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges."). The same cannot be said with respect to Plaintiff's other alleged injuries, for which there is no medical consensus, and as to which Plaintiff alone offers general causation opinions—albeit unreliably. And a consensus on general causation does not absolve the need to establish specific causation. *Id.*

[13]    *See generally Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1316–17 (11th Cir. 2011) (cautioning trial courts to remain "vigilant" in reviewing the testimony of treating physicians, noting their proffered testimony often goes "beyond th[e] sphere" of "their experience in the course of providing care" and "purport[s] to provide explanations of scientific and technical information not grounded in their own observations and technical experience"); *see also* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, Reference Guide on Toxicology, 633, 676 (3d ed. 2011) ("Generally, physicians are quite knowledgeable about the identification of effects and their treatment. The cause of these effects, particularly if they are

At least four other aspects of Dr. Jones's testimony and expert report further demonstrate the unreliability of his causation opinions. He (1) fails to rule out the background risk of idiopathic dysplasia; (2) relies on federal regulatory limits; (3) offers no opinion on the dose-response relationship between benzene and dysplasia, opining instead without support that any level of benzene exposure is too much; and (4) relies on naked speculation to reach his conclusions.

First, Dr. Jones fails to reliably account for the background risk of dysplasia, that is, the risk everyone faces of suffering dysplasia without exposure to benzene. *McClain*, 401 F.3d at 1243 ("A reliable methodology should take into account the background risk."). Dr. Jones testified, "there could definitely be other reasons" than benzene exposure for Plaintiff's development of dysplasia. (Doc. 45-7 at 69:15–22.) For example, "people can develop mild dysplasia de novo, … meaning without any previous exposure." (*Id.* at 70:1–3; doc. 32-2 at 26:21–33 ("Certainly anybody can get … any dysplastic changes.").) When asked how he ruled out idiopathic causes for Plaintiff's dysplasia, Dr. Jones could not explain, stating, "it's hard to rule out idiopathic myelodysplasia because that is something that just happens." (Doc. 45-7 at 101:7–11.) This unexplained failure to reliably rule out

---

unrelated to the treatment of the disease, is generally of little concern to the practicing physician.").

idiopathic dysplasia places Dr. Jones's conclusions "in further doubt." *Kilpatrick*, 613 F.3d at 1342; *cf. id* at 1343 (excluding testimony where expert "clearly testified that he could not explain why potentially unknown, or idiopathic alternative causes were not ruled out").

Second, Dr. Jones supports his causation opinion by claiming that Plaintiff's use of JJCI's sunscreen resulted in absorption of benzene at levels exceeding federal limits. (Doc. 33-37 at 2.) Even if Dr. Jones knew how much benzene Plaintiff absorbed—which he does not (doc. 45-7 at 158:3–8, 176:1–22)—comparing that amount to federal limits would not reliably support a causation opinion. As the Eleventh Circuit has repeatedly explained, regulatory agencies conduct risk-utility analyses "involv[ing] a much lower standard than that which is demanded by a court of law." *Rider*, 295 F.3d at 1201. Those agencies may "err on the side of caution," *id.*, and their analyses do "not directly focus on the question of causation." *McClain*, 401 F.3d at 1250; *id.* at 1249–50 (distinguishing between "the type of risk assessment that a government agency follows for establishing public health guidelines versus an expert analysis of toxicity and causation in a toxic tort case"). Thus, even if residual benzene in JJCI's sunscreen exceeded regulatory limits, that would not establish a causal relationship between benzene and Plaintiff's injuries. *See id.*

Third, Dr. Jones offers no opinions on the dose-response level for benzene to cause bone marrow dysplasia. "When analyzing an expert's methodology in toxic tort cases, the court should pay careful attention to the expert's testimony about the dose-response relationship. … The expert who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology." *McClain*, 401 F.3d at 1241–42. Dr. Jones rests his causation opinions on the speculative conclusion that "no safe level of exposure [to benzene] exists." (Doc. 33-37 at 2.) His explanation for this conclusion is, "because we know that [b]enzene is a toxin[, a]ny level of [b]enzene[] would be dangerous to the general population." (Doc. 45-7 at 164:1–3.) This broad, generalized statement ignores "the importance of individual responses to toxins." *McClain*, 401 F.3d at 1241. It also ignores the "essential principles of toxicology," which hold that toxic dose "thresholds exist, such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual." *Id.* at 1242.

Despite concluding that there is "no safe level of exposure" to benzene, Dr. Jones recognizes that benzene's toxicity is "a dose-dependent effect." (Doc. 33-2 at 13:8–17.) He also acknowledges that scientific literature discusses the dose-response relationship between benzene and dysplasia, but admits he does not know what the threshold toxic dose is because "that's not something that would

be within [his] area of expertise." (*Id.* at 159:15–160:3.) Dr. Jones having acknowledged the dose-dependent relationship between benzene and dysplasia, his avoidance or neglect of this "principle of toxic torts without justification casts suspicion on the reliability of his methodology." *McClain*, 401 F.3d at 1241–42.[14] Neither his expert report nor Plaintiff's briefs provide any indication as to why Dr. Jones ignored the dose-response relationship in forming his opinions. They also provide no support for his conclusion that there is no safe level of exposure to benzene.

The only basis for that conclusion that this Court can find comes from a few comments made during Dr. Jones's deposition. In reference to one published study,

---

[14]     *See also McClain*, 401 F.3d at 1241, 1243 (rejecting expert's "any level is too much" opinion as conflicting with "the importance of individual responses to toxins" and "clearly contradict[ing] the principles of reliable methodology"); *Pinares v. Raytheon Techs. Corp.*, No. 19-14831, 2023 WL 2661521, at *4 (11th Cir. Mar. 28, 2023) (holding, "[t]he district court correctly held that [an expert] failed to support his opinion with scientific evidence" where that expert "didn't establish a dose-response relationship but asserted that *any* amount of the contaminants was too much" (emphasis in original) (citing *McClain*, 401 F.3d at 1243)); *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1276 (S.D. Fla. 2022) (precluding experts from offering "no threshold dose" opinions "based [in part] on Eleventh Circuit precedent on no-threshold dose opinions") (subsequent case history indicating dismissed appeals omitted); *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 885 (S.D. Ohio 2010), *aff'd sub nom. Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509 (6th Cir. 2013) (holding in a benzene exposure case that "the no threshold or one-hit theory is not an accepted causation theory under *Daubert*"); *id.* at 878 n.9 (collecting cases); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1165–66 (E.D. Wash. 2009) (declaring in a benzene exposure case that "[t]he use of the no safe level or linear 'no threshold' model for showing unreasonable risk 'flies in the face of the toxicological law of dose-response, that is, that "the dose makes the poison,"'" and noting that "[o]ther courts have similarly rejected expert opinions that are based on the 'no-threshold' model" (citations omitted)).

Dr. Jones states, "the theme in my mind of this paper is that any level of benzene exposure can cause hematotoxicity. … And so even one part per million can cause changes in the bone marrow." (Doc. 32-2 at 39:18–40:6.) When asked why he believes that study reliably supports his conclusions, he answered, "I think it's important because it sort of underscores or emphasizes or confirms … the thought that any benzene exposure is unsafe." (*Id.* at 40:18–23.) This is circular reasoning: Dr. Jones relies on this study to conclude that any benzene exposure is unsafe, and he claims the study is reliable because it supports his conclusion.

He provides no description whatsoever of the study, its findings, its limitations, or its conclusions. *See Kilpatrick*, 613 F.3d at 1341 (finding expert's vague references to articles at deposition "not sufficient" to support his causation opinion or to "render his methodology reliable," noting the expert "had ample opportunity to identify all the bases for his conclusions and to explain his methodology"); *see also McDowell*, 392 F.3d at 1299 ("Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts." (citing *Daubert*, 509 U.S. at 591)). This Court cannot simply take his word for it. *McClain*, 401 F.3d at 1244 (citation omitted).

Fourth and finally, Dr. Jones testified that the reason he concluded JJCI's sunscreen caused Plaintiff's dysplasia is because Plaintiff was "exposed to a very dramatic level of" benzene. (Doc. 33-2 at 26:13–21.) This proffered rationale is already suspect given Plaintiff's admission that none of his experts, Dr. Jones included, even attempted to calculate his total benzene exposure. (Doc. 56 ¶ 56.) *McClain*, 401 F.3d at 1245 ("The *Daubert* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." (emphasis, quotations, and citation omitted)). It becomes even less reliable with the exclusion of Dr. Cheu's test results, which comprise Dr. Jones's only evidence that Plaintiff was exposed to any benzene at all from JJCI's sunscreen, let alone "dramatic" levels. (Docs. 45-7 at 106:6–14; 32-2 at 29:17–20.) *Cf. Rink*, 400 F.3d at 1294 (affirming the exclusion of expert testimony that relied on another expert's excluded findings); FED. R. EVID. 702(b) (requiring expert opinion testimony to be "based on sufficient facts or data").

The only support Dr. Jones adds to this flawed premise is the temporal connection between Plaintiff's alleged benzene exposure and the onset of his symptoms. (Doc. 32-2 at 34:19–35:3, 37:21–38:7, 176:22–177:7.) As previously

explained, such speculative specific causation testimony is "inherently unreliable." *Kilpatrick*, 613 F.3d at 1342. It is even less reliable here in the context of Dr. Jones's related testimony. He first states that Plaintiff's "clinical abnormalities" occurred "early from a temporal standpoint" compared to "other bone marrow toxins," which cause dysplasia five to seven years after exposure. (Doc. 45-7 at 141:15–20, 143:16–144:18.) He then agrees he lacks "familiarity with … the lead time of [b]enzene exposure and how it might impact the finding of dysplasia." (*Id.* at 144:21–145:3.) Finally, he concedes that this "timing issue" could "just as much indicate" to him that Plaintiff's abnormalities "could be from something else" because there is "no way" for him to know "it's from [b]enzene." (*Id.* at 145:4–10.)

### 4. *Dr. McAuley*

Dr. McAuley claims to be an expert in, among other things, epidemiology, environmental toxicology, exposure assessments, human health exposure, toxic torts, and environmental litigation. (Doc. 69-26 at 4, 15.) He also claims to have "significant" experience in dealing with benzene exposure. (Doc. 33-16 at 29:12–35:14.) He has degrees in chemistry, biochemistry, and environmental science and engineering. (Doc. 69-26 at 4.) Out of all of Plaintiff's experts, Dr. McAuley appears to be the most capable and qualified to conduct a benzene exposure assessment in support of a specific causation opinion. Indeed, he explained during his deposition

how he might have conducted exposure modeling in this case to determine Plaintiff's total cumulative dose of benzene exposure, which could have been used to establish a causal link between benzene and Plaintiff's bone marrow dysplasia. (Doc. 45-14 at 63:2–66:13.) But he did not do so because he was not asked to. (*Id.* at 65:21–66:16.)

Dr. McAuley's expert disclosure indicates his intent to opine that Plaintiff's "level of exposure" to benzene "would cause him to suffer acute or chronic adverse health effects." (Doc. 69-26 at 2.) His deposition testimony, however, reveals that this opinion is based entirely on a comparison of federal regulatory limits to Dr. Cheu's test results. (Doc. 45-14 at 73:18–76:24.) Accordingly, this opinion is due to be excluded as unreliable in part for the same reasons as Dr. Jones's—Dr. Cheu's test results are excluded, and proving that exposure exceeded regulatory limits does not reliably support a causation opinion. *See McClain*, 401 F.3d at 1249–50. Dr. McAuley's reliance on regulatory limits is even more dubious in light of his concession that you could have a sunscreen can with fifty (50) times the allowable benzene, but you still could not extrapolate a specific causation opinion from that data without running an exposure model.[15] And he did not run an exposure model.

---

[15]    (Doc. 45-14 at 163:23–164:9 ("[Y]ou could have a sunscreen can that has 100 PPM of benzene in it where the guidance says [] the amount of benzene is not to exceed 2 PPM, but

Dr. McAuley's opinion is also due to be excluded for another reason. As Defendants argue, "Dr. McAuley capitulated just minutes into his deposition, admitting that based on the thin record before him, and without any evidence of dose response, he could not opine that Plaintiff's alleged benzene exposure caused any disease." (Doc. 48 at 14.) That is, Defendants assert that Dr. McAuley disclaimed any specific causation opinions.[16] After a careful review of his testimony, this Court finds Dr. McAuley in agreement with Defendants' assertion.

At most, it appears Dr. McAuley intends to testify it is possible, not probable, that benzene caused Plaintiff's bone marrow dysplasia.[17] When asked directly whether he plans to testify at trial that Plaintiff's exposure to benzene in JJCI's sunscreen caused his bone marrow dysplasia, Dr. McAuley responded, "I would plan to testify there may -- there's a possibility, but I could not s[ay] definitively that, in fact, that is the case." (Doc. 45-14 at 54:19–55:2.) Furthermore, Dr. McAuley agreed he would have to perform a "risk assessment or dose response" analysis to "develop[e] a specific causation" opinion, which he said he would have

---

unless you run an exposure model … you can't really say one way or the other whether [an exposed person] would be expected to have adverse health consequences.").)

[16]    Defendants also claim Plaintiff abandoned Dr. McAuley's specific causation opinion based on Plaintiff's response brief, which frames Dr. McAuley's opinion as establishing only general causation. (*See* doc. 64 at 15–18.)

[17]    Dr. McAuley is only aware of Plaintiff's alleged bone marrow dysplasia, not his other alleged injuries. (Doc. 45-14 at 7:23–8:4.)

done "[i]f that was something [he] was tasked with." (*Id.* at 117:2–118:10.) Ultimately, Dr. McAuley conceded that "we don't know whether [Plaintiff's] adverse health effects were or were not related to benzene." (*Id.* at 117:2–118:10, 221:5–18.) Accordingly, Dr. McAuley's specific causation opinion, if any, is due to be excluded. *Cf. Reed v. Tracker Marine, LLC*, 574 F. Supp. 3d 1065, 1076 (N.D. Ala. 2021) (excluding expert testimony where the expert was "'by his own admission unqualified to testify' on the issue" (quoting *Day, LLC v. Plantation Pipe Line Co.*, 315 F. Supp. 3d 1219, 1228 (N.D. Ala. 2018))).

### 5.  Dr. Cheu

Dr. Cheu offers testimony on his HS-GC-MS testing and the results thereof. With those testing results due to be excluded pursuant to Defendants' motion for sanctions, so, too, his testimony. Accordingly, the Court does not address Defendants' arguments regarding the reliability of Dr. Cheu's testing and testimony.

### C.  Defendants' Motions for Summary Judgment

Each of Plaintiff's claims requires him to show that benzene from JJCI's sunscreen caused his alleged injuries. *McClain*, 401 F.3d at 1237; *see Lowery v. Sanofi-Aventis LLC*, 535 F. Supp. 3d 1157, 1171–72 (N.D. Ala. 2021) (addressing nearly identical causes of action and collecting precedent); *Jones v. Novartis*

*Pharms. Corp.*, No. 2:13-CV-624-VEH, 2017 WL 553134, at *5 (N.D. Ala. Feb. 10, 2017), *aff'd sub nom. Jones v. Novartis Pharms. Co.*, 720 F. App'x 1006 (11th Cir. 2018) (same).

This being a toxic tort case, Plaintiff must establish both general and specific causation, that is, that benzene can and in fact did cause each of his alleged injuries. *McClain*, 401 F.3d at 1239. The "minimal facts necessary" for Plaintiff to sustain this burden include "scientific knowledge of the harmful level of exposure to [benzene] plus knowledge that [P]laintiff was exposed to such quantities." *Id.* at 1241 (alteration accepted) (quoting *Allen*, 102 F.3d at 199). To establish such knowledge and avoid summary judgment, Plaintiff is "*required* to have *Daubert*-qualified, general and specific-causation-expert testimony that would be admissible at trial." *Chapman*, 766 F.3d at 1316 (emphasis in original) (citing *Guinn*, 602 F.3d at 1252). Plaintiff's experts fail to quantify his benzene exposure and they offer no reliable testimony as to the level of benzene required to cause his injuries. *Cf. Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 n.2 (11th Cir. 2018). Moreover, with the exclusion of Dr. Cheu's spoliative test results, there is no record evidence that Plaintiff was exposed to any benzene from Defendants' products. Accordingly, Defendants are entitled to summary judgment, and this Court need not address

their other arguments for the same. *Chapman*, 766 F.3d at 1316; *Jones v. Novartis Pharms. Co.*, 720 F. App'x 1006, 1007–08 (11th Cir. 2018) (*per curiam*).

## IV.    Conclusion

The Court closes with these oft-cited words of then-Chief Judge Posner: "the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). Regardless of any sympathy this Court may have for Plaintiff's asserted inability to produce such reliable scientific evidence as controlled experiments firmly establishing the effects of benzene on humans, which would be unethical, "courts may only admit the state of science as it is." *Rider*, 295 F.3d at 1202. Thus, this Court does not today hold that benzene cannot or did not cause Plaintiff's alleged injuries; only that he has failed to prove it with reliable evidence.

For the reasons explained herein, Defendants' motion for sanctions based on spoliation of evidence (doc. 39) is due to be **GRANTED**, resulting in the outright dismissal of Plaintiff's claims. In the alternative, Defendants' motion for sanctions is due to be **GRANTED** to the extent they seek the exclusion of Dr. Cheu's spoliative testing results and any expert opinions relying on those results. Consequently, their motion to exclude Plaintiff's expert testimony (doc. 37) is also due to be **GRANTED** to the extent they seek the exclusion of specific causation testimony, and as

otherwise consistent with this Opinion. Plaintiff's claims being unsupported by reliable expert causation testimony, Defendants' motions for summary judgment (docs. 41, 43) are due to be **GRANTED**. Plaintiff's motions (docs. 33, 34, 35) are due to be **DENIED AS MOOT**. The Court will enter an Order consistent with this Opinion.

**DONE** and **ORDERED** on August 7, 2024.

_____
L. Scott Coogler
United States District Judge

215647